```
             UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
                   TAMPA DIVISION
```

JOSE ANTONIO SUAREZ
CASCAJARES, in his individual
capacity,

       Plaintiff,

v.	Case No. 8:14-cv-3150-T-33AEP

BANK OF AMERICA, N.A.,

       Defendant.
_____/

**ORDER**

This cause is before the Court pursuant to Defendant Bank of America, N.A.'s Motion for Final Summary Judgment filed on September 23, 2015. (Doc. # 46). Plaintiff Jose Antonio Suarez Cascajares filed a response on November 9, 2015. (Doc. # 57). Bank of America filed a reply on December 4, 2015. (Doc. # 62).  For the reasons that follow, Bank of America's Motion for Final Summary Judgment is denied.

## I. Background

### A. Factual Background

This case arises from a dispute concerning a 1984 receipt confirmation of a certificate of deposit (CD) account, that Suarez found in 2008, which BankAmerica International had previously issued to Suarez's deceased father and mother.

(Doc. # 46 at 1). Suarez's father, Jose Maria Suarez Richard, was a resident of Guatemala and passed away on February 28, 1984. (Doc. ## 2 at ¶ 2; 44-1 at 15:9-10). Sometime before his death, Suarez's father deposited $85,068.64 with BankAmerica International. (Doc. # 2 at ¶ 17). On June 19, 1984, after the death of Suarez's father, BankAmerica International issued a CD in consideration of the deposit for $85,068.64. (Id. at ¶ 7). The CD was made in the name of "Jose Maria Suarez or Mercedes Cascajares de Suarez [in trust for] Jose Antonio or Mercedes Suarez Cascajades."[1] (Doc. # 57-1). The CD also reflected the following information:

    (1)   "Deposit Confirmation Advice"
    (2)   "Contract Number 122165"
    (3)   "non-negotiable" and "non-transferable"
    (4)   "From 6/19/84 to 12/18/84"
    (5)   "Interest to be paid at 11.20000% on 12/18/84"
    (6)   "Amount US$ 85,068.64"
    (7)   "Interest at maturity $4,750.79"
    (8)   "We will remit $89,819.43"

(Id.).

    Sometime in 2008, Suarez found the CD while preparing to move from his former home. (Doc. # 46-3 at 6). Suarez

---

[1] According to Suarez's deposition and affidavit, "Jose Maria Suarez" is his father, "Mercedes Cascajares de Suarez" is his mother, "Jose Antonio" is Suarez, and "Mercedes Suarez Cascajades" is another name for his mother. (Doc. ## 44-1 at 18:21-25; 57-2 at ¶ 8.).

testified at his deposition that he found a box which contained the CD at issue, as well as another CD, letters, and correspondences made by his father. (Doc. # 44-1 at 12:6-15). Suarez testified that according to his father's notes, the other CD was redeemed. However, no such notes were contained on the CD at issue, because his father died before the CD slip was created. (Doc. ## 44-1 at 15:5-10; 57-2 at ¶ 10). Additionally, Suarez testified that his mother had a stroke that left her in a coma and that he managed his mother's finances after his father's death. (Doc. ## 44-1 at 14:9-13; 37:10-16; 57-2 at ¶ 12). Suarez also testified that he lived next door to his father and mother's house and that he would go to the mailbox to retrieve the mail. (Doc. # 44-1 at 40:7-11, 40:21-24). At no time, did Suarez recall receiving any correspondence from Bank of America relating to the CD after his father's death. (Doc. # 44-1 at 37:17-20).

Subsequent to finding the CD, Suarez went into the office of Bank of America located in Tampa, Florida, to inquire as to the status of the CD. (Doc. ## 2 at ¶ 9; 57-2 at ¶¶ 16-17). An agent of Bank of America gave Suarez a phone number to call regarding the funds. (Id.). Suarez called the number provided and Bank of America agreed to research the status of

the CD in exchange for Suarez paying a $20.00 per hour fee. (Doc. ## 2 at ¶ 10; 57-2 at ¶ 18).

In 2009, Suarez again contacted Bank of America in an attempt to locate the funds from the CD. (Doc. ## 2 at ¶ 11; 57-2 at ¶¶ 20, 22). Bank of America told Suarez that he would need to be named the executor of his father's estate in order for Suarez's claim to the funds to be processed. (Id.). Suarez was named executor of his father's estate on September 4, 2012. (Doc. ## 2 at ¶ 12; 57-2 at ¶¶ 22-23).

On November 13, 2012, Bank of America informed Suarez that it had no information on the CD and that the funds must have escheated to the state. (Doc. ## 2 at ¶¶ 13-14; 57-2 at ¶¶ 24-25). Suarez verified with the states of Florida, California, and New York that no such funds escheated to the state. (Id.).

Thereafter, in March 2013, Suarez made a formal demand for the payment of the funds due on the CD plus interest of 11.2%. In a letter dated, April 5, 2013, Bank of America refused to pay the funds allegedly owed under the CD. (Doc. # 57-4).

**B. Procedural Background**

Suarez filed suit on November 14, 2014, against Defendants, Bank of America, N.A., BankAmerica International

Financial Corporation, and BankAmerica International Corporation, in the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida. (Doc. # 2). Suarez filed this action in his capacity as the executor of his father's estate, the Estate of Jose Maria Suarez Richard. (Id.).

The Complaint alleges two counts. (Id.). Count I is a claim for breach of contract. (Id.). Count II is a claim for unjust enrichment. (Id.). Defendants timely removed to this Court on the basis of diversity jurisdiction. (Doc. # 1).

Thereafter, a mediation conference was held on July 8 and 10, 2015. (Doc. ## 33 and 35). At the mediation, the parties stipulated to substitute Suarez in his individual capacity for Suarez in his capacity as executor. (Doc. # 35). Additionally, the parties stipulated to name Bank of America, N.A. as the only Defendant in the case. (Id.).

Subsequently, Bank of America filed its Motion for Final Summary Judgment on September 23, 2015. (Doc. # 46). Suarez responded on November 9, 2015. (Doc. # 57). On December 4, 2015, Bank of America filed a reply. The Motion is now ripe for the Court's review.

II. **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

    An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue

for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

**III. Analysis**

The central issue in this case is whether the money from the CD has already been paid. Bank of America argues that the Court should grant summary judgment in its favor because: (1) contract law, rather than Florida Statute 673.1041(4), which

7

mirrors the Uniform Code § 3-104, governs the parties' obligations as to the CD; (2) no presumption of nonpayment arises from Suarez's possession of the CD receipt; (3) Florida common law presumes payment after lapse of twenty years; (4) Suarez has presented insufficient proof to present any cause of action; and (5) Suarez's causes of action are barred by the statute of limitations.

### A. **Statute of Limitations**

The Court will first examine whether the statute of limitations has expired as to Counts I and II. Bank of America argues that Suarez became aware of the purported breach or benefit retained by Bank of America, sometime in 2008. (Doc. # 46 at 16-17). In support of this argument, Bank of America points to a telephone call Suarez had with Bank of America in 2008, and a letter provided to Suarez by Bank of America, dated November 19, 2008. (Id.) On the other hand, Suarez argues that the purported breach by Bank of America did not occur in 2008, because Bank of America did not refuse to pay the CDs funds at that time. (Doc. # 57 at 12). Suarez states that it wasn't until April 5, 2013, when Bank of America expressly refused to pay the CD funds. (Id.).

Florida Statute Section 95.11(2)(b) provides that "[a] legal or equitable action on a contract, obligation, or

liability founded on a written instrument" must be commenced within five years of the date the cause of action accrues. "A cause of action on a contract accrues upon the breach of the contract." Barbara G. Banks, P.A. v. Thomas D. Lardin, P.A., 938 So. 2d 571, 574 (Fla. 4th DCA 2006)(citing Mosher v. Anderson, 817 So. 2d 812, 814 (Fla. 2002)). When a party refuses to pay funds owed, the breach occurs and the cause of action accrues.  See Barbara G. Banks, P.A., 938 So. 2d at 574.

In his deposition, Suarez states the following regarding the 2008 telephone call with Bank of America.

> Q: What was the date you located the certificate of deposit at issue in this case?
> A: What date?
> Q: Date or year, whatever you remember?
> A: 2008
> Q: When was the first time that you asked the bank to give you the money for the CD?
> A: It was just moments after I found that certificate of deposit.
> Q: Okay. And they told you they would not redeem it, or what did they tell you?
> A: *To contact an attorney.*
> Q: And did you understand that to mean that they were not going to give you the money?
> A: Perfectly.

(Doc. # 44-1 at 13:11-15; 21:11-14; 22:10-14). (emphasis added). Regardless of any understanding that Suarez may have reached on his own accord, the simple fact is that Bank of America did not utter any words refusing payment of the funds

during the 2008 telephone call. In fact, Suarez confirms this in his sworn affidavit. (Doc. # 57-2). In particular, Suarez states, "Bank of America did not inform me that it refused to pay any funds associated with the receipt. Instead, Bank of America continued to investigate my claim and I believed it had not yet decided if it would pay me." (Id. at ¶ 19).

Further, the letter dated November 19, 2008, which Bank of America refers to, does not put Suarez on notice of any purported breach or benefit retained by Bank of America. (Doc. # 46-2 at 33). This letter specifically states, "[w]e received your inquiry concerning Certificate of Deposit (CD) research fee. We are unable to refund the $100.00 research fee without a copy of the paid check." (Id.). Nowhere in the letter is Bank of America refusing to pay the funds of the CD. Instead, the letter is informing Suarez about the inability to refund a $100.00 research fee. Therefore, this letter cannot be construed as Bank of America's breach or the date of when the cause of action accrued.

Rather, the Court finds that Suarez's argument is bolstered by the continuing dialogue between Bank of America and Suarez regarding the CD after 2008. In particular, later in 2009, Bank of America informed Suarez that in order to process his claim to the CD, he would need to be named

executor of his father's estate. (Doc. # 57-2 at 4 ¶ 20). Subsequently, in a letter dated November 13, 2012, Bank of America stated the following:

> [w]e performed a thorough search of the Bank's records in an attempt to locate accounts belonging to Jose Maria Suarez and located no information. If you have additional documentation account statement etc, which would indicate that there may be accounts in the name of Jose Maria Suarez at Bank of America, please forward a copy in the envelope provided along with the original court document from the state where the account(s) is domiciled . . . .

(Doc. # 46-2 at 35). In neither of those two ensuing communications does Bank of America refuse payment of the CD funds. Rather, the Court finds that based on Bank of America's correspondences with Suarez, as of November 13, 2012, Bank of America was still investigating Suarez's claim.

As Suarez points out, Bank of America's refusal to pay the funds of the CD occurs unequivocally in a letter dated April 5, 2013. (Doc. # 46-2 at 54). In this letter, Bank of America states "we respectfully decline your demand for payment, and regret any disappointment without resolution." (Id.) Therefore, since Suarez filed suit on November 14, 2014, the Court finds that Suarez was well within the five year statute of limitations for a breach of contract claim.

Similarly, although Bank of America also argues Suarez's unjust enrichment claim accrued sometime in 2008, following the previous analysis, the Court finds that Suarez did not become aware of Bank of America's alleged inequitable "retention of a benefit" until Bank of America's refusal to pay the funds in its April 5, 2013, letter. See Della Ratta v. Della Ratta, 927 So. 2d 1055, 1059 (Fla. 4th DCA 2006)(The elements of a cause of action for unjust enrichment are: "(1) plaintiff has conferred a benefit on the defendant; (2) defendant has knowledge of the benefit; (3) defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value for it."). Accordingly, Suarez was also within the four year statute of limitations for an unjust enrichment claim. See Fla. Stat. § 95.11(3)(k); see also, Swafford v. Schweitzer, 906 So. 2d 1194, 1195 (Fla. 4th DCA 2005)(holding the limitations period for an unjust enrichment action is four years.)

**B. Florida Common Law and Presumption of Payment After Lapse of Time**

"The doctrine that, in the absence of rebutting circumstances, debts will be presumed paid after twenty years

12

from the time they were due, is too well settled to require authority to support it." 1 A.L.R. 779. However, the presumption of payment arising from lapse of time is not conclusive, but is rebuttal. Id. The Florida Supreme Court in Buckmaster v. Kelly, stated,

> The general rule has come to be settled that in a suit . . . the lapse of twenty years without demand or payment of interest will raise a presumption of payment, and in order to rebut this presumption it must be shown affirmatively that the money has not been paid, . . . and there is no precise rule or quality of evidence prescribed. Each case must rest upon its own circumstances and address itself to the reason of the tribunal.

15 Fla. 180, 194-95 (1875).

The purpose of this doctrine is two-fold. First, the doctrine is intended to discourage suits for stale demands and negligence of parties in delaying to prosecute their claim for an unreasonable length of time, when they had the means and opportunity of enforcing them. Id. Second, the doctrine is intended for the protection of the debtor, whose receipts or vouchers may perhaps be lost, or witnesses be dead or removed, or the true state of the transaction be otherwise obscured by the lapse of time. Id.

At the outset, the Court determines that there are genuine issues of material fact precluding summary judgment in favor of Bank of America. Even assuming that Bank of

13

America is correct that Florida common law controls and that a presumption of payment exists from the lapse of twenty years without demand of payment, summary judgement is still not appropriate. A thorough review of the record establishes that there is evidence from which a jury could find that the presumption of payment based on a lapse of time was rebutted and that the funds were not paid by Bank of America.

Bank of America argues that Florida's presumption of payment applies in this action due to the lapse of 24 years before Suarez made a demand for the alleged CD funds. (Doc. ## 46 at 10-12; 62 at 2). To support its argument, Bank of America relies on a New York decision granting summary judgment in Krawitt v. KeyBank, 23 Misc.3d 297, 871 N.Y.S. 2d 842 (N.Y. Sup. 2008) and a Pennsylvania decision in Griffith v. Melon, N.A., 328 F. Supp. 2d 536 (E.D. Pa. 2004). (Id.).

In both Krawitt and Griffth, the plaintiffs were seeking to redeem CDs a number of years (eighteen and twenty-seven respectively) after they were issued by defendant banks. In both cases, the trial courts granted summary judgment in favor of the banks, finding that the plaintiffs failed to rebut the presumption of payment because the *only* proof offered by the plaintiffs was possession of the CDs or their receipt.

Nevertheless, the Court finds that Krawitt and Griffth are distinguishable from the present case. Suarez has offered testimony that his father died on February 28, 1984, four months before BankAmerica International issued the CD. (Doc. # 44-1 at 15:9-10). The CD maturity date was December 18, 1984, ten months after the death of Suarez's father. (Doc. # 57-1). Then, Suarez provides testimony that less than a week after the death of his father, his mother suffered a severe stroke that left her "practically in a coma." (Doc. ## 44-1 at 14:9-13; 57-2 at ¶ 12). Consequently, Suarez testifies that he managed his mother's finances after his father's death. (Doc. ## 44-1 at 37:10-16; 57-2 at ¶ 12). Suarez also testified that since he lived next door to his mother, he would go to the mailbox and retrieve the mail. (Doc. ## 44-1 at 40:7-12, 40:21-24; 57-2 at ¶ 12).

Contrary to Bank of America's arguments from these facts a jury could find that Suarez has established sufficient evidence to rebut the presumption of nonpayment. Given Suarez's testimony, a reasonable juror could find that Suarez's father could not have redeemed the funds due to the timing of his death and the creation of the CD. Additionally, given Suarez's mother's health condition and Suarez's management of her finances, a reasonable juror could also

find that Suarez would have known whether his mother received the funds. Lastly, a reasonable juror could find that Bank of America's lack of documentation can be attributed to the fact that the funds were deposited with a different bank, BankAmerica International.

Unlike Krawitt and Griffth, Suarez has offered more than the CD slip to rebut the presumption of payment. Thus, in viewing this evidence in the light most favorable to Suarez, as the non-moving party, there is a genuine issue of material fact. Therefore, based on the record, it is the role of the jury to consider the evidence in this case and determine whether the presumption was rebutted and whether the funds were paid. Anderson, 477 U.S. at 255 (stating "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Bank of America's Motion for Final Summary Judgment (Doc. # 46) is **DENIED**.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 15th day of December, 2015.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE